Filed 6/21/22  P. v. Lewis CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. ARTHUR LEE LEWIS et al., Defendants and Appellants. | B306777 c/w B310252 (Los Angeles County Super. Ct. No. TA146087) |

APPEAL from an order of the Superior Court of Los Angeles County, Sean D. Coen, Judge. Affirmed.

Kieran D. Manjarrez, under appointment by the Court of Appeal, for Defendant and Appellant Arthur Lee Lewis.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Dequan Gordon.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendants and appellants Arthur Lee Lewis and Daniel Dequan Gordon were both convicted of robbery and conspiracy to commit a second robbery. Lewis was also convicted of conspiracy to commit murder. They appeal their convictions, raising multiple contentions. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Although the jury found charged gang enhancements not true, in order to accurately describe the trial, we have included in our factual recitation evidence of defendants' gang connections.

**1.  *Grape Street Crips and YNM***

Both defendants are members of the Grape Street Crips gang. The gang specifically claims as its territory the Jordan Downs housing projects; there are some 200 members who live in and around Jordan Downs. Grape Street is an enemy of a number of gangs.

Defendants also are both members of a small set within Grape Street, called YNM. YNM has around 20 members, including defendant Lewis, defendant Gordon, their friends Arkeefe Sherrills and Daijah Ellsworth, and their former friend, Deanthony Bradford. Sherrills, Ellsworth and Bradford were initially charged with defendants. While the record is unclear on what happened to the charges against Sherrills and Ellsworth, Bradford ultimately entered a guilty plea and testified against defendants.

**2.  *The Crimes***

We begin with some history of what led up to defendants' crimes. This case has its genesis in a fight between defendant Lewis and Timothy Orange, also a member of Grape Street, but a former member of the rival East Coast Crips. Orange got the better of Lewis, until Lewis's friend Sherrills intervened. Later

2

that night, Lewis's friends helped Lewis obtain a gun and together they planned to shoot Orange. Their machinations were traced in real time by police, who were listening to cell phone conversations among Lewis and others.[1] Police intervened and prevented the shooting. For some time afterwards, Orange continued to bad-mouth Lewis and his friends on social media. Unable to effect revenge directly on Orange, Lewis and his friends, including defendant Gordon, robbed Orange's cousin, Damon Bowden.

Lewis was convicted of conspiracy to murder Orange. Lewis and Gordon were convicted of robbing Bowden. Lewis and Gordon were also convicted of conspiring to rob another man, Robert Arreola. Their plan to rob Arreola was discussed in wiretapped phone calls, but they were unable to actually commit the robbery because other friends beat them to the punch.

The details of our summary follow.

A.    *The Initial Fight Between Defendant Lewis and Orange*

On the evening of September 14, 2017, defendant Lewis fought Orange over some marijuana. Lewis's arm was injured in the fight. As Lewis later explained in a wiretapped phone call, Orange tried to get at a gun, but Sherrills intervened and turned the tide in Lewis's favor.[2] Sherrills rendered Orange "unconscious, stumbling." After the fight, Orange remained in

---

[1]    Defendants do not challenge the lawfulness of the wiretaps.

[2]    In a phone call the following day, Lewis spoke with an unidentified female and told her that he was in a fight with Orange, whom he called by his gang moniker.

3

Jordan Downs for an unknown period. No charges were brought against defendants for this fight.

      B.     *The Conspiracy to Commit Murder -- Getting a Gun and Going After Orange*

Later that night (September 14, 2017), defendant Lewis had a number of phone calls with fellow YNM members, in which he tried to acquire a gun. Once he had a firearm, he tried to learn Orange's location. The phone calls took place while Lewis was in a car driven by Sherrills. At one point, Lewis gave Sherrills directions. At 7:17 p.m., Lewis called another man. Before that man picked up, Lewis complained aloud, apparently to Sherrills, about his injured arm. He then swore an oath, on the memory of a deceased gang member, "Man, it's over for him. It's over homie."[3]

At 7:18 p.m., Lewis spoke to Ellsworth, a female YNM member. Lewis told Ellsworth that he was with Sherrills and was trying to get a gun; she said she had a 9 millimeter handgun, and suggested that she could send Lewis to someone who could give him another firearm.

At 7:21 p.m., Ellsworth called Lewis back. When he said he had not yet obtained a gun, she agreed to accompany Lewis and Sherrills, saying, "y'all gonna have to pick it up and I'ma ride behind y'all." They met up, in separate vehicles. Lewis and Ellsworth continued to coordinate their locations by cell phone, driving six or seven miles from Jordan Downs to obtain the gun. At one point, Ellsworth called Lewis, and told him to direct Sherrills to take a back street "cus the Sherriff's hot."

---

[3]     The police wiretaps sometimes picked up conversation on the initiating end of the call before the recipient picked up.

By 7:47 p.m., Lewis had obtained a gun.  Then, Lewis, Sherrills and Ellsworth headed back toward Jordan Downs.

The police officers who were monitoring the phone calls had become concerned.  LAPD Sergeant Jason Cook checked with other LAPD officers and learned that a large group was forming.  He requested additional uniformed officers to go to Jordan Downs.  He also requested plainclothes officers to look for a vehicle that was associated with defendant Lewis.  (At this point, the police had not identified Sherrills or Ellsworth as the other voices on the phone calls.)

Sergeant Cook believed the individuals on the calls had been trying to get a gun to kill someone.[4]  He requested a

---

[4]     An objection that this was speculative was overruled.  Shortly thereafter, Sergeant Cook testified, "I believed that Mr. Lewis and whoever he was with was going to shoot and kill somebody."  Lewis's counsel's objection was again overruled, but the court offered a limiting instruction, stating, "This is not going to the ultimate opinion, but this is relevant to show what the officer was doing or why the officer was doing what he was."

The topic arose later during Lewis's counsel's cross-examination.  Sergeant Cook stated, "You know, I mean, I really believed on this day that Mr. Lewis and Mr. Sherrills were going to shoot and kill Mr. Orange."  Counsel stated, "We know that.  We know you believed that."  Counsel added, "And I objected when you had that opinion before.  That's in your gut as a police officer, but the jury is going to make that decision based on the transcripts and what is actually said.  [¶]  Is it fair – do you think other people may have a different feeling based on these conversations?"  A relevance objection to the last question was sustained.

Counsel continued to pursue the line of questioning, asking if Sergeant Cook was taking "the most conservative view" of the conversations he overheard.  Sergeant Cook explained, that,

helicopter fly over Jordan Downs and the use of a spotlight to try to locate various individuals. He also asked for support from the Sheriff's Department, as Jordan Downs was near the Sheriff's jurisdiction.

At 7:52 p.m., one of defendant Lewis's friends called him, and told him the police were in the vicinity. A minute later, Lewis called Ellsworth and asked if she was armed. When she said she was not, Lewis replied that people are saying the police are out.

There were no significant phone calls for nearly 40 minutes. In the interim, the police made their move.

At 8:21 p.m., Detective Carlos Carrillo spotted defendant Lewis standing near a parking lot in Jordan Downs where Grape Street members were known to congregate. Lewis was with a group of five other men near the entrance to the parking lot. When Detective Carrillo and his partner got out of their marked police car and approached the men, the group dispersed without incident.

The following day, in another recorded phone call, Lewis recounted the initial fight with Orange. He added, "On Young, so now I'm just going to make sure my gun on me."[5]

---

based on the totality of the calls, the fact that Lewis sought out a gun and returned to Jordan Downs (rather than going safely home) made Sergeant Cook believe he was going there "to hurt somebody." On appeal, neither defendant asserts error based on the admission of this testimony.

[5] "On Young" is an oath used by YNM members to swear on their set. Similarly, Grape Street members use "On Grape" to swear upon the gang, and "On Geo" or "On Beezy" to swear on the memory of deceased gang members.

Seven weeks later – on November 9, 2017 – defendant Lewis again called Ellsworth, asking if she had a home address for Orange. When asked why, he explained that Orange kept popping up, telling people to stay away from defendants and Sherrills, and claiming that he (Orange) was going to "air shit out." Ellsworth said she could try to get Orange's address, but Lewis could not disclose his source.

A minute later, Lewis and Sherrills spoke by phone. Lewis asked if Sherrills still had Uber, as Lewis needed to get "to the hood." Lewis said, "I'm about to do it!" He added, "On Young, he right there. On Geo, I just got to call in. A nigga is about to do it."

A few hours later, Ellsworth called defendant Lewis. She told him, "It's Central and 50th." Orange could, in fact, be found a short walk from 50th and Central. The record does not indicate what Lewis did with this information. Chronologically, this was the last act of the conspiracy according to the prosecution's theory of the case. The conspiracy did not come to fruition. Lewis was not immediately arrested.

C.    *Robbery of Orange's Cousin, Bowden*

Bowden is Orange's cousin. Orange's moniker (Little Heav) was a "Little" version of Bowden's moniker (Heavy or HD). When a gang member takes a "Little" version of an existing gang member's name, it is out of respect for their "big homie," and demonstrates a connection between the "little homie" and "big homie."

Bowden frequently hangs out at a house on Lou Dillion Ave., near Jordan Downs. He sold marijuana. On October 16, 2017 – three weeks before the last of the wiretapped phone calls we have described –YNM members defendant Lewis, defendant

7

Gordon, Sherrills, Oneisha Jacobs (Gordon's girlfriend) and Bradford together robbed Bowden at the Lou Dillon house.

Bowden, who very much did not want to testify, denied being robbed. However, he had previously told a detective about the robbery. Bradford, who had pleaded guilty, testified to the robbery. Other wiretapped phone calls confirmed that it had taken place.

According to Bradford, the group robbed Bowden because Orange had posted something on social media that was insulting to the group. Orange did not live in Jordan Downs, where the situation could have been addressed directly, so the group took it out on his cousin, instead. The robbery was planned the same day it happened.

The robbers drove over in two cars. Bradford drove Sherrills and defendant Lewis; defendant Gordon rode in his girlfriend's car. Once they arrived, Gordon's girlfriend checked to make sure Bowden was alone. Upon confirmation, the men knocked on the door and went inside while she stayed outside.[6] Bowden let them in; the men pretended they were there to get some marijuana, like usual, but "then flipped the script on him." Bowden had previously sold marijuana to all of them except for Gordon, who did not smoke.

Once the men were sitting down, Sherrills pulled a gun on Bowden and they started the robbery. Defendant Gordon took jewelry; defendant Lewis took cash from Bowden's pockets; the men also took some marijuana from the table. Sherrills then

---

[6] Gordon was, at the time, wearing an ankle monitor. The tracking showed him at or near the Lou Dillon house at the time of the robbery, although the accuracy of the tracking can be off by as much as 60-70 feet when indoors.

handed the gun to Bradford while Sherrills and the two defendants searched the house. When Bowden asked what was happening, the robbers told him "ask your little homie," referring to Orange. After the men finished searching the house, they left. The robbers split the marijuana and the money, and the next day pawned Bowden's jewelry.

Vernon Williams is an older member of Grape Street and is "up in rank." The police were also tapping Williams's phone. Bowden is his cousin. At 9:51 that night, Bowden called Williams and reported the robbery, identifying Bradford, Sherrills, and defendant Lewis as among the robbers. He did not mention defendant Gordon.

Williams was livid. He called Bradford and ordered him, Sherrills and Lewis to bring back everything they had taken from Bowden. Williams added that Bowden had nothing to do with Orange. He said that if they wanted to do something to Orange, they should go ahead and shoot him, but they shouldn't take it out on Bowden.[7]

Because Bowden had not identified defendant Gordon as one of the robbers, Williams did not know that Gordon was there. Later, Gordon spoke with Bradford, and said "[Bowden] must not have said my name or something." He repeated, "I didn't think [Bowden] must've said – or he don't know my name." In a recorded phone call on the day after the robbery, defendant Gordon admitted his participation in the crime, stating, "we just booked [Bowden]." "Book" is slang for robbing.

---

[7]     Williams specifically complained that the men had robbed Bowden rather than putting in "work" for the gang by, for example, robbing an enemy gang.

D.    *Conspiracy to Rob Arreola*

Robert Arreola is a member of Grape Street, but not YNM. Defendants were convicted of conspiracy to rob Arreola. As none of the contentions they raise on appeal relate directly to this charge, we limit our discussion of the facts.

In a number of phone calls, defendant Lewis and defendant Gordon discussed with each other and/or other YNM members that Arreola had an expensive watch they wanted to take from him.

On the evening of November 6, 2017 – three days before the last act that comprised the conspiracy to murder Orange – Sherrills put Arreola in a chokehold and robbed him of his jewelry. Seizing the opportunity, Bradford joined in, taking money out of Arreola's pockets. Others, but not defendants (who were not present), participated as well. Later, when, the robbers told defendant Lewis what they had done, Lewis said he did not like that they "got my move" as he had been trying to rob Arreola personally.

## 3.    ***The Charges***

Defendants were charged by amended information with the following crimes: Lewis was charged with conspiracy to murder Orange (Pen. Code, § 182, subd. (a)(1))[8] and attempted murder of Orange (§§ 664/187); Lewis and Gordon were both charged with robbing Bowden (§ 211); and Lewis and Gordon were charged with conspiring to rob Arreola (§ 182, subd. (a)(1)).[9] A number of

---

[8]    All further statutory references are to the Penal Code unless otherwise indicated.

[9]    Defendants were also charged with the robbery of another individual, Burnell Lewis. Prior to submitting the case to the

10

sentence enhancements were alleged. Specifically, a gang enhancement was alleged with respect to each count (§ 186.22).[10] As to the Bowden robbery, it was alleged that the defendants acted voluntarily in concert and entered a structure, within the meaning of section 213, subdivision (a)(1)(A). Finally, the information alleged that Gordon had suffered a prior serious felony conviction within the meaning of section 667, subdivision (a)(1) and the Three Strikes law (§ 1170.12).

**4.    *Pretrial Motions***

Prior to trial, defendant Gordon moved to bifurcate the gang allegations from the trial of the crimes. The trial court denied the motion, but bifurcated trial on the prior conviction allegations against Gordon.

During jury selection, Gordon's counsel twice made *Batson/Wheeler* motions directed to the prosecution's exercise of peremptory challenges against African-American female jurors.[11] Each time, the trial court found no prima facie case had been made, but permitted the prosecutor to state his reasons for the

---

jury, this count was dismissed on the joint motion of the prosecution and defense. As noted, the felony complaint was originally filed against several other individuals, but the trial proceeded only against defendants Lewis and Gordon.

[10]    It was also alleged, in connection with the Bowden robbery and the conspiracy and attempt to murder Orange, that a principal personally used a firearm within the meaning of sections 12022.53, subdivisions (b) and (e)(1). That is, by statute, the only firearm enhancements alleged depended on the gang enhancement being found true.

[11]    *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

record.  The court then confirmed its rulings denying the motions, noting that the prosecutor had offered non-discriminatory reasons for excusing the prospective jurors.

**5.      *Bradford's Testimony at Trial***

At trial, the prosecution relied heavily on wiretapped phone calls to support its case.  It also offered the testimony of gang member Bradford, who had participated in the Bowden and Arreola robberies, but had now turned against the gang.

Bradford testified that his deal with the district attorney involved his promise to plead guilty to the charges in this and another case, and his promise to testify truthfully.  According to Bradford, if he breaches the agreement, he will be sentenced to the full term in both cases – and he was facing life without parole in the other matter.  If he keeps his agreement and testifies truthfully, he will receive a sentence of nine years.

On direct examination, Bradford explained that he committed several crimes in 2016.  He told the police some (but nowhere near all) of what he had done, and he was not immediately charged.  Thereafter, he participated in the Bowden and Arreola robberies.  He was not charged until 2018, for the crimes in this and another case.  In May 2019, he gave a "proffer statement" in which he was queried about a number of crimes, and told police what he knew.  In August 2019, he signed a leniency agreement in which he agreed to testify truthfully.

On cross-examination by defendant Gordon's counsel, Bradford explained that, on August 31, 2016, he was first interviewed by Detective Pearce of the LAPD, then by Detective Blagg of the Sheriff's Department.  Counsel, who had been provided a transcript of the interview by the sheriff's detective, but not the earlier interview by the police detective, cross-

12

examined Bradford on lies he told during the sheriff's interview. Bradford admitted that he "was lying" during that interview. He explained, "I was trying to, like, get released right there and it didn't happen. It didn't work." He was also cross-examined on misstatements he made in later interviews.

## 6.    *The Verdicts*

While deliberating, the jury submitted a question asking, "Does the gang enhancement on any of the charges have to be agreed upon? If we are at a standstill 10 to 2?" In response to this question, the court asked if there were partial verdicts, and, after the jury responded affirmatively, chose to take the partial verdicts while the jury continued to work. Although the parties had thought the jury's question indicated the jury was struggling with the gang enhancement, the jury had, in fact, not yet reached a verdict on Gordon's guilt of the Bowden robbery. The following day, the jury reached a verdict on that count.

Defendant Lewis was found guilty of conspiracy to commit murder (Orange), robbery with the "in concert" finding (Bowden), and conspiracy to commit robbery (Arreola). He was found not guilty of attempted murder (Orange). The gang enhancement was found not true.[12] Defendant Gordon was found guilty of robbery with the "in concert" finding (Bowden), and conspiracy to commit robbery (Arreola). The gang enhancement was found not true.

---

[12]    The jury found that a principal was armed, but since by statute the firearm enhancement depended on the gang enhancement being true, the finding is not relevant, and the court did not impose a firearm enhancement.

13

Sentencing was continued several times over six months, largely because of COVID-19 delays.

### 7. *Lewis's Sentence*

On July 22, 2020, defendant Lewis was sentenced to an indeterminate term of 25 years to life for conspiracy to commit murder. As to his determinate term, defendant Lewis had recently been sentenced to a determinate term of 21 years in another case (TA144866, "manslaughter case"). That sentence was reimposed. Lewis was also sentenced to consecutive terms (1/3 the middle term) of two years for the Bowden robbery, and one year for the conspiracy to rob Arreola. He filed a timely notice of appeal.

Although he was not sentenced at this hearing, Gordon admitted his prior serious felony conviction.

### 8. *Gordon's New Trial Motion*

After trial, the district attorney discovered the existence of a recording of Bradford's initial August 31, 2016 interview with police Detective Pearce. This interview was conducted prior to Bradford's interview with Sheriff's Detective Blagg, which had already been disclosed. Upon discovery, the prosecutor immediately turned over the recording to Gordon's counsel.

On October 9, 2020, defendant Gordon moved for a new trial on multiple grounds, including that the failure to turn over Bradford's initial police interview constituted a violation of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).[13] Gordon argued that the initial interview, in which Bradford told police numerous lies, was impeachment material and that the failure to disclose was

---

[13] Defendant Gordon conceded that the prosecutor had acted in good faith, and that the failure to disclose was simply a mistake.

14

prejudicial: If the interview had been disclosed there was a reasonable probability that the jury's verdict would have been different. Bradford was the prosecution's "star witness" who lied to police for two hours in this interview, and the jury had initially hung on Gordon's guilt of the Bowden robbery.[14]

The prosecution argued that the late-disclosed recording was cumulative to materials that had previously been disclosed, and would not have caused a different result. The prosecution attached as evidence a CD which contained all of the impeachment evidence of Bradford it had disclosed to the defense – from both the pretrial disclosures and the late-disclosed initial interview with Detective Pearce.[15] The trial court reviewed the materials and denied the new trial motion, concluding there was no reasonable probability the jury would have reached a different result.

## 9. *Gordon's Sentence*

Defendant Gordon was sentenced to a total of 25 years in prison, calculated as the high term of 9 years for the Bowden robbery, doubled for the strike; with a consecutive 2 years (1/3 the middle term doubled) for the Arreola robbery conspiracy; plus

---

[14] Defendant Gordon also noted that the police's questioning at the first interview implied Bradford might have been involved in another shooting, and he could have cross-examined Bradford on this as well, further damaging his credibility.

[15] The clerk's transcript on appeal included a photocopy of the CD, not the contents of the disk. We have obtained the contents of the CD from the superior court, in order to properly address defendant Gordon's appellate arguments.

5 years for Gordon's prior serious felony conviction.  He filed a timely notice of appeal.

We consolidated the two appeals.

### *DISCUSSION*

On appeal, Defendant Gordon initially argued:  (1)  the trial court erred in denying his *Batson/Wheeler* motions; (2)  the trial court prejudicially erred in denying his motion to bifurcate the gang enhancement allegations; and (3)  the trial court should have granted his new trial motion for *Brady* error.

Defendant Lewis initially argued:  (4)  there is insufficient evidence that he conspired to commit murder, rather than any lesser offense; (5)  the trial court should have sua sponte instructed on the lesser included offense of conspiracy to commit assault with a firearm; and (6)  the trial court should have sua sponte instructed on unanimity with respect to whether the conspiracy to murder was in September 2017 or November 2017.  Because the determinate sentence in this case reimposed the determinate sentence in his unrelated manslaughter case, which was then on appeal, defendant Lewis (7)  reasserted the arguments against his sentence he had raised in that appeal.  By means of supplemental briefing, both defendants argue (8)  their sentences should be remanded in light of recently enacted Senate Bill No. 567 (2021-2022 Reg.Sess.) (SB 567).[16]

---

[16]     SB 567 amended section 1170 dealing with, among other things, the calculation of determinate sentences.  Defendants also submitted letter briefs on new statutory enactments which, they contend, fortify their argument on the gang enhancement bifurcation issue.

We discuss the issues in the order they arose during the proceedings – pretrial motions, trial issues, posttrial motion for new trial, sentencing.  Thus, our discussion is organized as follows:  first, defendant Gordon's challenges to the rulings on his pretrial motions; second, defendant Lewis's arguments regarding his conspiracy conviction; third, defendant Gordon's new trial motion; and fourth, both defendants' sentencing issues.

## 1.    *Gordon's Contentions Relating to Pretrial Motions*

### A.    *The Batson/Wheeler Motions Were Properly Denied*[17]

Defendant Gordon contends the trial court erred in denying his two *Batson/Wheeler* motions.[18]  Because of the limited nature of Gordon's argument, it is helpful to address first the applicable legal principles before turning to the voir dire of the challenged prospective jurors.

"The law is clear and firmly established.  ' "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race." '  [Citation.]  ' "Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community

---

[17]    In his reply brief on appeal, defendant Lewis joins this argument.  As we conclude the argument has no merit, the joinder is inconsequential.

[18]    Jury selection in this case occurred before the effective date of Code of Civil Procedure section 231.7, which enacted a number of changes to the evaluation of *Batson/Wheeler* motions.  Neither party suggests that this section has any application to this appeal.  (See Code of Civ. Proc., § 237.1, subd. (i) ["This section applies in all jury trials in which jury selection begins on or after January 1, 2022."].)

under article I, section 16 of the California Constitution." ' [Citation.]  The law also recognizes ' "a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." [Citation.]  "A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges.  First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria.  Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge.  Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination.  [Citation.]  'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].' " ' [Citation.]" (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 759-760 (*Holmes*).)

As to each *Batson/Wheeler* motion in this case, the trial court found no prima facie case – its ruling was therefore limited to the first prong – the court then permitted the prosecutor to state on the record his reasons for striking the jurors.  After the prosecutor's statement of reasons the court briefly indicated the *Batson/Wheeler* motion remained denied.  The record is not entirely clear as to whether the statement purported to incorporate a ruling on the validity of the prosecutor's reasons.[19]

_____

[19]    After the first *Batson/Wheeler* motion, defendant Gordon's counsel disagreed with the prosecutor's characterization of one of the prospective jurors.  The court stated, "Okay.  Well, again, as long as there is another reason not based upon her race or

18

But what is clear is that the court never found a prima facie case. Under these circumstances, regardless of whether the court ruled on the validity of the prosecutor's reasons, our task is to review the court's initial finding that there was no prima facie case. (*People v. Scott* (2015) 61 Cal.4th 363, 386, 391 (*Scott*).)

Defendant Gordon argues that the court erred in failing to find prima facie discrimination.[20] A prima facie case is

---

ethnicity and that's what he described, so --." Similarly, after the prosecutor was permitted to state his reasons on the record in connection with the second *Batson/Wheeler* motion, Gordon's counsel interjected that the juror had said she could set aside all of her negative experiences with law enforcement, and the trial court stated, "That's not relevant, because, again, what's being stated is this non-race based/gender based for the reason of excusing of a juror. You can have your opinion, but, you know, that's where the record stands."

When a trial court actually undertakes a third stage inquiry, which this trial court did not, it must "make a reasoned effort . . . to evaluate the nondiscriminatory justification the prosecutor offered" for striking the juror. (*People v. Salinas* (2022) 77 Cal.App.5th 20, 33.) The ultimate question is not whether the prosecutor offered a non-discriminatory reason, but whether that reason was genuine. (*Id*. at p. 36) We view the trial court's statements after the prosecutor's response as reiterating its earlier ruling, not engaging in third prong analysis.

[20] Defendant does not, however, agree that, if we find a prima facie case was established, we can then proceed to the third stage inquiry. Instead, he argues that the trial court wrongfully injected itself into the proceedings as an advocate for the prosecution, and "conceived" of reasons that supported the prosecution, "without even articulating those reasons for the record." As such, he argues that reversal of the judgment is

established if the objector "produces sufficient evidence to support an inference that discrimination occurred." (*Holmes, supra,* 12 Cal.5th at p. 760.)  There are a number of factors a court is to consider in determining whether a prima facie case has been established.  Relevant for our purposes is that a court may consider nondiscriminatory reasons for a peremptory challenge that are apparent from and clearly established in the record and that necessarily dispel any inference of bias.  (*Ibid.*)  This is different from relying on the reasons a *prosecutor* gives to preserve the record even after the trial court finds no prima facie case.  "[A] reviewing court may not rely on a prosecutor's statement of reasons to *support* a trial court's finding that the defendant failed to make out a prima facie case of discrimination.  Although a court reviewing a first-stage ruling that no inference of discrimination exists 'may consider apparent reasons for the challenges discernible on the record' as part of its 'consideration of "all relevant circumstances" ' [citation], the fact that the prosecutor volunteered one or more nondiscriminatory reasons for excusing the juror is of no relevance at the first stage." (*Scott, supra,* 61 Cal.4th at p. 390.)[21]

---

necessary.  As we shall discuss, we disagree with this characterization of the record.

[21]     Gordon argues at length that California Supreme Court authority is out of step with U.S. Supreme Court precedent, in that California improperly permits reliance on a prosecutor's stated reasons in reviewing a finding that no prima face case was established.  The argument fails to take notice of the *Scott* opinion we cite in the text.

20

Other evidence relevant to the issue of establishment of a prima facie case includes "whether a party has struck most or all of the members of the identified group from the venire; has used a disproportionate number of strikes against the group; or has only engaged the panelists in desultory voir dire."[22] (*Holmes, supra,* 12 Cal.5th at pp. 760-761.)

We review for substantial evidence the trial court's finding that a party has not established a prima facie case. (*People v. Bonilla* (2007) 41 Cal.4th 313, 341.)

We turn to a discussion of the jury voir dire and defendant Gordon's motions, and whether defendant established a prima facie case. We pay particular attention to whether nondiscriminatory reasons for the prosecution's peremptory challenges are apparent from and clearly established in the record. (*Holmes, supra,* 12 Cal.5th at p. 760.)

        (1)    *First Batson/Wheeler Motion*

Defendant Gordon first made a *Batson/Wheeler* motion after the prosecution had exercised its fifth peremptory challenge in a row against an African-American woman. Gordon's counsel later stated that, while the prosecutor had dismissed five African-American women, his "issue" was with the third juror. (Juror No.

---

[22] Also relevant is whether the defendant is a member of the identified group and whether the victim is a member of the group to which a majority of the jurors belong. (*Holmes, supra,* 12 Cal.5th at p. 761, fn. 17.) Here, defendants are African-American, but to the extent Gordon's *Batson/Wheeler* motion focused on the prosecution's exercise of challenges against African-American women in particular, defendants are not members of that group. The race of the victims was not specifically identified in this case, but defendants do not suggest there were cross-racial issues implicated.

21

14.) Our review of the record suggests that this was likely because there were obvious nondiscriminatory reasons for the prosecutor's exercise of the other four challenges.

The prosecutor's first five challenges were to Juror No. 8, Juror No. 16; Juror No. 14, Juror No. 6, and, finally, Juror No. 1. As to the four jurors other than Juror No. 14, the trial court reasonably could have found that, from the record, there were nondiscriminatory reasons to exclude each of those jurors, thus dispelling any inference of bias, and defeating a prima facie case. Those jurors either volunteered negative experiences with law enforcement; had murdered or incarcerated relatives who had been members of Grape Street; and/or had previously served on a jury which hung. It is apparent that nondiscriminatory reasons existed for the prosecution's challenge of these four jurors. (See, e.g., *People v. Reed* (2018) 4 Cal.5th 989, 1001 [negative experience with law enforcement is a valid nondiscriminatory reason; previous service on a hung jury is a valid reason]; *People v. Lenix* (2008) 44 Cal.4th 602, 620 [gang affiliation of murdered relative is a valid reason].)

The focal point of defendant Gordon's initial *Batson/Wheeler* motion was Juror No. 14. She expressed hesitation about being a juror because she was bothered by "judging the character of my fellow man." When the prosecutor asked Juror No. 14 if she would be comfortable voting "guilty" if he proved his case beyond a reasonable doubt, she answered, "I feel okay."

After the prosecution excused five African-American women, defendant Gordon made his *Batson/Wheeler* motion. The basis offered for the motion was that all of the prosecutor's peremptory challenges had been to African-American women.

22

The court denied the motion, finding that, "based upon the answers that the five individuals that were dismissed gave," a prima facie case had not been established. The court permitted the prosecutor to put his reasons on the record.[23] Thereafter, the court noted that there were four African-American jurors seated in the jury box at the time and four other African-American jurors in the audience. Defense counsel argued against the prosecutor's stated reasons for dismissing Juror No. 14. He made no further argument in favor of a prima facie case beyond noting that the prosecution had challenged five African-American women and the defendants are both Black.

Juror No. 14 expressed reluctance to serve as a juror because she was uncomfortable judging her fellow man. This is a non-discriminatory basis, unrelated to race or gender, which constitutes a nondiscriminatory reason to excuse the juror. In addition, we recognize the cursory nature of Gordon's showing as moving party. He relied only on the fact that the prosecution's first five challenges were against African-American women, even though four of those challenges were beyond dispute. He provided no evidence of the number of African-American women in the venire.[24] It cannot be determined whether the prosecutor's use of peremptory challenges was disproportionate to their

---

[23] As we are concerned with the court's ruling on the prima facie case, we do not discuss the prosecutor's stated reasons.

[24] The trial court volunteered the number of African-American prospective jurors in the jury box and in the audience at the time of the motion, but there is nothing in the record as to the race of the prospective jurors dismissed by the defendants or the total breakdown of the venire by race and gender.

representation in the group without knowing their representation in the group. "In establishing a prima facie showing, a defendant has the burden of demonstrating that the facts and circumstances of the case raise an inference that the prosecutor excluded prospective jurors based on race. [Citation.] In making such a showing, a defendant should make as complete a record of the circumstances as is feasible. [Citation.]" (*People v. Hawthone* (2009) 46 Cal.4th 67, 79.) A superficial showing, based only on the percentage of the prosecutor's challenges directed to African-American prospective jurors, with no mention of the number of group members in the entire venire or in the jury panel at the time the motion was made, is insufficient.[25] (*Id.* at pp. 79-80.)

Considering the totality of the circumstances, we conclude substantial evidence supported the trial court's finding that the defense failed to make a prima facie case there were nondiscriminatory reasons "apparent from and clearly established in the record and that necessarily dispel any inference of bias." (*Holmes, supra,* 12 Cal.5th at p. 760.)

Gordon makes the separate argument on appeal that the trial court's finding must be reversed because the court erroneously injected its own opinions into the case. Specifically, defendant Gordon takes issue with the trial court's statement that "based upon the answers that the five individuals that were dismissed gave," there was no prima face case established.

---

[25] In his reply brief on appeal, Gordon states that "the record does not demonstrate any prospective jurors who were both *black* and *female* remained in the jury box or in the gallery, nor that any black *female* individuals were seated on the jury." As Gordon is the appellant, this absence of information in the record does not establish a prima facie case; it confirms that defendant Gordon failed to meet his burden to establish one.

24

Gordon argues that, by this statement, the court "supplied acceptable reasons for the prosecution to dismiss" the prospective jurors, "but did not even disclose what all those reasons were." On this basis, he argues that we cannot apply the substantial evidence test, "because the judge crossed the line to become an advocate for the prosecutor." We disagree. The trial court properly applied the law, concluding, based on facts apparent in the record, that non-discriminatory reasons appeared for the dismissal of the prospective jurors. What happened here is dissimilar to the ruling in *People v. Tapia* (1994) 25 Cal.App.4th 984, 1007, 1014-1015, in which the trial court improperly relied on a reason outside the record (a letter a prospective juror gave the trial court which had not yet been disclosed to counsel). Instead, as it was obligated to do, the trial court here considered nondiscriminatory reasons that were apparent in the answers given by the prospective jurors. Substantial evidence supported the ruling that the defense had not made out a prima facie case. (*Holmes, supra,* 12 Cal.5th at p. 760.)

(2)  *Second Batson/Wheeler Motion*

Following the denial of Gordon's first motion, additional prospective jurors were added to the jury box, including new prospective Juror No. 1, who would later be the subject of the second *Batson/Wheeler* motion.

Juror No. 1's voir dire indicated that she had several law enforcement officers in her family – a fact which is often presumed to make a prospective juror favorable to the prosecution. However, when she was asked if she had a particularly positive or negative experience with law enforcement, she offered a negative one. When she was a postal worker, working the swing shift, she "often got pulled over at

25

least once a week for no reason at all."  The officers pulling her over would let her go once they realized she had relatives in the department.  She would ask why they stopped her and, "[t]hey would never give me an answer."  She even asked one of the officers for his badge number.  "He really didn't want to give it to me . . ." and he "was quite nasty."  She definitely believed she was being profiled.  She had also previously been on a hung jury.

Initially, the prosecutor accepted the panel with Juror No. 1 on it.  After the defense challenged additional jurors, the prosecutor accepted a panel including Juror No. 1 two further times.  Following another defense challenge, the prosecutor excused Juror No. 1, and Gordon made his second *Batson/Wheeler* motion.

Gordon argued that this motion was inclusive of the last, and suggested there was no good faith reason for the prosecutor to dismiss Juror No. 1, as she had family in law enforcement.  The trial court stated, "I will, again, based upon her answers, specifically the police contact with this juror, I do not find a prima faci[e] showing has been made of this individual."  The court again allowed the prosecutor to put his reasons on the record.  After he did so, the court indicated that the prosecutor had stated a "non-race based/gender based" reason for dismissing the juror.

As with the first *Batson/Wheeler* motion, there is substantial evidence, based on the totality of the circumstances, that Gordon had not established a prima facie case of discrimination.  Juror No. 1 had volunteered a previous negative experience with law enforcement, and previous service on a hung jury, both of which are valid non-discriminatory reasons recognized in caselaw.  It is also noteworthy that, prior to

26

striking the juror, the prosecution had thrice accepted the panel with Juror No. 1. (See *People v. Lenix, supra,* 44 Cal.4th at p. 629 [the prosecution's acceptance of the panel containing a Black juror strongly suggests that race was not a motivating factor in challenges].)

B. *There Was No Prejudicial Error in Denying Bifurcation of the Gang Enhancement Allegation*

(1) *Proceedings in the Trial Court*

Prior to trial, defendant Gordon alone moved to bifurcate trial on the gang enhancement.[26] The trial court denied the motion, saying, "I think it would be overly confusing to the jury if the allegation were bifurcated. That's because it's so intertwined with the facts that we have here based upon what I've heard so far from all you as well as reading the opposition by the People and deciphering the language, the certain motives that are present. It would – I'm not sure how we would even put the case on by bifurcating the gang allegation. So that motion – or the request is denied."

On appeal, defendant Gordon argues that the court prejudicially erred in denying bifurcation. While recognizing that the jury found the gang enhancement allegation untrue, he argues that no reasonable jury would have been able to separate out the prejudicial gang evidence when considering the substantive offenses. In particular, Gordon argues that the gang evidence prejudicially impacted the jury's verdict on the "in concert" allegation on the Bowden robbery count. "Although the gang evidence was prejudicial as to both [robbery] counts, the gang evidence explains why the jury found Gordon guilty of home-invasion robbery *in concert*, despite justification for finding

---

[26] Defendant Lewis now joins in the argument on appeal.

27

reasonable doubt on that element." "As to Gordon, joinder of the criminal street gang enhancements had the effect of joining a 'weak' case on the issue of acting in concert inside the residence with a strong case of gang membership." As we understand it, defendant Gordon has narrowed his argument to prejudice only as it affected the "in concert" finding because there was a dispute in the evidence as to whether he had actually entered the residence where Bowden was robbed. He does not appear to argue that the prejudice affected the jury's guilty verdict on the robbery itself.[27]

>            (2)    *Analysis*

In October 2021, the Legislature passed Assembly Bill No. 333, which amended the language of the gang enhancement statute and, in addition, added a new law, section 1109, which provides for bifurcation of gang enhancements "[i]f requested by the defense." (§ 1109, subd. (a).) We sought additional briefing on the effect, if any, of this statute. Both defendants filed letter briefs arguing that section 1109 was retroactive to cases pending on appeal. The Attorney General argued that section 1109 is not retroactive, but that even if it is, the failure to bifurcate in this case is harmless.

We agree with the second part of the Attorney General's argument – any error was harmless. "Even if section 1109 applied retroactively to [the defendant's] case—an issue we need not and do not decide here—[the defendant] cannot show it is 'reasonably probable' he would have obtained a more favorable result if his trial had been bifurcated. [Citation.]" (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480.) This is so because, as the trial

---

[27]    Gordon also does not argue that the prejudice impacted his conviction of conspiring to rob Arreola.

28

court recognized, the vast bulk of the gang evidence would have been admissible in the trial of the charged offenses even in the absence of the gang enhancement allegation. The crimes were proven, in large part, through recordings of the wiretapped phone calls of defendants and their fellow gang members. In those calls, the participants spoke in gang vernacular, frequently sprinkling their conversation with "On Grape," "On Young," "On Beezy," "On Geo" and similar oaths, which could not be understood in the absence of evidence of gang membership. Evidence of gang rivalries was also interwoven with evidence of the substantive offenses. Defendant Lewis identified Orange by his prior affiliation with "Toast," a derisive name for East Coast Crips. Proof of the Bowden robbery was based on statements by Grape Street higher-up Williams. Williams yelled at Bradford for robbing Bowden and complained that they were going after one of their own, rather than "putting [in] work." He specifically complained that they robbed Bowden rather than Bounty Hunters, a statement that could only be understood in the context of existing gang rivalries.[28] The context for Bowden's reluctance to testify was the gang prohibition on snitching. Bradford also explained that, by testifying against the gang, he risked any number of bad things, including death.

　　　To be sure, some testimony of the prosecution's gang expert – particularly as to predicate offenses – would not have been admitted at a trial on the substantive offenses if the gang enhancements had been bifurcated. But this testimony was a small part of the prosecutions' case in a trial which was

---

[28]　"[Y]ou guys ain't putting no work in at all, on Geo. . . . Ya'll ain't gonna rob no Bounty Hunter nigga spot, ya'll ain't doing nothing. Ya'll rob poor HD [Bowden], come on my nigga, on Geo."

necessarily steeped in gang evidence.  That the admission of this additional evidence was not prejudicial to defendants is demonstrated by the fact that the jury found the gang enhancements untrue – the jury evinced no bias against defendants because they were gang members.

We reject Gordon's specific argument that the gang evidence was prejudicial on the issue of whether he went inside the house at the Bowden robbery.  Not only did Bradford testify that Gordon went into the house, Gordon himself impliedly confirmed it.  When Bradford and Gordon discussed Williams's call – and Bowden's specific failure to identify Gordon as a participant in the robbery – Gordon did not say that he was lucky he remained outside; he instead said, "I didn't think [Bowden] must've said – or he don't know my name," implying that Bowden saw him during the robbery, but could not identify him by name.

Defendant Lewis, by supplemental letter brief, argues that he was prejudiced by the failure to bifurcate in connection with his conviction of conspiracy to commit murder – because the prosecution relied on gang expert testimony to explain the meaning of the gang language used in the wiretapped phone calls and relied on gang members' joint association in the gang as evidence in support of the conspiracy.  But none of the gang evidence he identifies as problematic is evidence that would have been excluded had the gang enhancement been bifurcated.  The evidence of the conspiracy did involve gang language and gang members plotting revenge.  This evidence consisted of admissions of a party opponent.  (Evid. Code, § 1220.)  Expert testimony was admissible to explain gang speak in words the jurors were likely to understand.  (*People v. Champion* (1995) 9 Cal.4th 879, 924-925 & fn. 14, overruled on other grounds in *People v. Combs*

30

(2004) 34 Cal.4th 821, 860.)  At bottom, defendant Lewis's argument is simply an offshoot of his argument that there is insufficient evidence of a conspiracy to commit murder, to which we next turn.

**2.      *Lewis's Contentions Related to His Conviction for Conspiring to Murder Orange***

Defendant Lewis raises three contentions related to his conviction for conspiring to murder Orange.  First, he argues the evidence is insufficient to establish a conspiracy to commit murder, as opposed to a conspiracy to commit a lesser offense.  Second, he argues the court should have instructed the jury on the lesser included offense of conspiracy to commit assault with a firearm.  Third, he argues the court should have given a unanimity instruction with respect to the charge.  We reject each contention.

A.      *The Evidence Was Sufficient as to Conspiracy to Commit Murder*

When considering a challenge to the sufficiency of the evidence, " ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citations.]  We consider ' "whether . . . any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.]  '[A] reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citation.]" (*Holmes, supra,* 12 Cal.5th at p. 780.)

31

"A conspiracy is an agreement by two or more persons to commit any crime. [Citations.] A conviction for conspiracy requires proof of four elements: (1) an agreement between two or more people, (2) who have the specific intent to agree or conspire to commit an offense, (3) the specific intent to commit that offense, and (4) an overt act committed by one or more of the parties to the agreement for the purpose of carrying out the object of the conspiracy. [Citations.] [¶] The elements of conspiracy may be proven with circumstantial evidence, 'particularly when those circumstances are the defendant's carrying out the agreed-upon crime.' [Citations.] To prove an agreement, it is not necessary to establish the parties met and expressly agreed; rather, 'a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design.' [Citation.]" (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024-1025.)

The dispute over the object of the conspiracy here relates to the intent elements. Lewis concedes that the evidence shows that, following his fight with Orange, he obtained a gun and headed back to Jordan Downs. He argues that there is insufficient evidence, however, that he had formed a plan with at least one other person to murder Orange, or that any of his purported co-conspirators shared murderous intent.

Lewis understates the evidence. He represents the evidence shows that once he obtained a gun, he drove back to Jordan Downs *by himself*. But there is evidence that he was in a car with Sherrills, and that Sherrills was driving. The evidence shows that, in between calls in which defendant Lewis attempted to obtain a gun, he said to Sherrills, "Man, it's over for him. It's

32

over homie.  That's on BL."[29]  This is sufficient to establish Lewis intended to kill Orange, and he expressed this intent aloud to Sherrills.  Thereafter, Sherrills continued to drive Lewis, following directions that Lewis relayed from Ellsworth.

Lewis argues that his shared gang affiliation with Sherrills and Ellsworth is an insufficient basis from which to infer a shared intent to kill.  We agree.  "Standing alone, a gang's general agreement to fight rivals may not suffice to support a particular conspiracy charge [citation.]"  (*Holmes, supra,* 12 Cal.5th at p. 781.)  But here there was additional evidence far beyond shared gang membership:  Lewis swore to Sherrills that it was over for Orange; in Sherrills's presence, he asked multiple people to help him obtain a gun; early on in the conspiracy, Ellsworth said that she could help him get one; Ellsworth offered to "ride behind" Lewis and Sherrills; together, a gun was obtained; and Ellsworth continued to give Lewis and Sherrills directions on where to drive to avoid police.  Given Lewis's sworn oath that it was over for Orange, this is sufficient evidence of a conspiracy to murder him.

This conclusion is further supported by the events two months later, in November 2017.  Defendant Lewis obtained Orange's location from Ellsworth, and – after Ellsworth said she could get it – excitedly told Sherrills "I'm about to do it!"  It is significant that Lewis did not feel the need to tell Sherrills what he was "about to do," which suggested it was well known between the two that Lewis intended to kill Orange.

---

[29]  BL is a reference to "Beezy lot," a parking lot nicknamed after deceased gang member Beezy.  Among Grape Street members, "on BL" is a similar oath to "on Beezy."

Substantial evidence supported the jury's finding that Lewis conspired to commit murder.

B.     *The Court Was Not Required to Instruct on Conspiracy to Commit Assault with a Firearm*

Defendant Lewis next contends the court erred in failing to instruct the jury sua sponte on the lesser included offense of conspiracy to commit assault with a firearm.[30]

A trial court has a duty to instruct sua sponte on lesser included offenses when there is substantial evidence the defendant is guilty of only the lesser offense. (*People v. Cook* (2001) 91 Cal.App.4th 910, 917 (*Cook*).) "To determine whether a lesser offense is necessarily included in a greater charged offense, one of two tests must be met. [Citation.] The 'elements' test is satisfied if the statutory elements of the greater offense include all the elements of the lesser offense so that the greater offense cannot be committed without committing the lesser offense. [Citation.] The 'accusatory pleading' test is satisfied if 'the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater [offense] cannot be committed without also committing the lesser [offense].' [Citation.]" (*Id.* at p. 918.)

Assault with a firearm is not a lesser included offense to murder under the elements test; it is possible to commit murder without committing assault with a firearm. (*Cook, supra,* 91 Cal.App.4th at pp. 918-919.) For that reason, conspiracy to commit assault with a firearm is not a lesser included offense of conspiracy to commit murder under the elements test.

---

[30]     Defendant Lewis's brief also refers to the supposed lesser included offense of "reckless arson." This appears to be inadvertent; there was no fire in this case.

34

The question becomes whether conspiracy to commit assault with a firearm is a lesser included offense of conspiracy to commit murder under the accusatory pleading test. Specifically, when the *overt acts* alleged include an assault with a firearm, is a conspiracy to commit assault with a firearm a lesser included offense to conspiracy to commit murder?[31]

Case authority is split on this question. In *Cook, supra,* 91 Cal.App.4th 910, the Third Appellate District concluded that "the trial court may look to the overt acts pleaded in a charge of conspiracy to determine whether the charged offense includes the lesser included offense." (*Id.* at p. 914.) There, it was the defendant who claimed error in the trial court's instruction on the lesser included offense. The defendants had been charged with conspiracy to commit murder. The overt acts alleged included that the conspirators acquired a firearm and that, in pursuit of the conspiracy, they shot and killed one victim and shot and wounded another. (*Id.* at p. 919 & fn. 22.) When murder is alleged to have been committed by means of a firearm, "it cannot be so committed without also committing an assault with a

---

[31] Here, the overt acts alleged do not include an assault with a firearm, but are not necessarily inconsistent with acts preparatory to an assault with a firearm. There were seven overt acts alleged in this case: "1. Co-conspirator(s) located a firearm. [¶] 2. Co-conspirator(s) drove to the location of the firearm. [¶] 3. Co-conspirator(s) obtained the firearm. [¶] 4. Co-conspirator(s) drove to the location where they believed the victim was located. [¶] 5. Co-conspirator(s) discussed obtaining the location of the intended victim a second time. [¶] 6. Co-conspirator(s) solicited transportation to the victim's location. [¶] 7. A co-conspirator relayed the victim's location to another co-conspirator."

35

firearm." (*Id*. at p. 920.)  The appellate court concluded that "the jury must determine which felony the defendants conspired to commit, and it cannot make that determination unless it is instructed on the elements of the target offense charged as well as the elements of any lesser included target offense which the jury could reasonably find to be the object of the conspiracy. [Citations.]  Thus, the trial court has a sua sponte duty to instruct the jury on a lesser included target offense if there is substantial evidence from which the jury could find a conspiracy to commit the offense." (*Id*. at p. 918.)  Because the overt acts alleged "necessarily include and gave notice of, the elements of assault with a firearm," the Court of Appeal held the trial court properly instructed the jury on the lesser target offense.  (*Id*. at p. 920.)

On the other side of the appellate conflict is *People v. Fenenbock* (1996) 46 Cal.App.4th 1688, in which Division One of the First Appellate District held "in the context of deciding whether the trial court was obligated to instruct sua sponte on lesser included offenses, we conclude that allegations of overt acts committed in furtherance of the alleged conspiracy do not provide notice of lesser included target offenses." (*Id*. at p. 1708.)  The reason for this is that, when the charged offense is conspiracy, "[i]t is the agreement, not the overt act in furtherance of the agreement, which constitutes the offense." (*Id*. at p. 1709.)  "In our view, it is the description of the agreement within the accusatory pleading, not the description of the overt acts, which must be examined to determine whether a lesser offense was necessarily the target of the conspiracy.  Here, the information alleged only that defendants conspired to murder [the victim].  There is nothing in this terse description of the agreement to

36

indicate an agreement with a lesser objective. We therefore hold that the trial court was not required to instruct the jury sua sponte on conspiracy to commit assault, battery, or mayhem as lesser offenses included within the charged offense of conspiracy to commit murder." (*Id.* at p. 1709.)

In *People v. Cortez* (2018) 24 Cal.App.5th 807, Division Two of the Fourth Appellate District charted a middle course. The court agreed with *Cook* to the extent that the alleged overt acts could be considered in determining whether the accusatory pleading encompasses an allegedly lesser included offense. (*Cortez,* at p. 820.) However, the focus must nonetheless be on the conspirators' *agreement*, not the conspirators' *acts*. That is, the court should consider whether the overt act allegations "establish[] that the defendant has agreed or conspired to commit lesser included target offenses." (*Ibid.*) There is no duty to instruct on conspiracy to commit assault with a firearm as lesser to conspiracy to commit murder when "[t]he description of the conspiratorial agreement to commit murder cannot be fairly read to describe or encompass . . . conspiracy to commit assault with a firearm . . . ." (*Id.* at p. 821.) The court noted that even if the defendants actually committed an assault with a firearm, this does not change the original nature of their conspiracy, which was to commit murder, and it did not render assault with a firearm a necessarily included target offense of the conspiracy to commit murder. (*Ibid.*)

We agree with *Cortez* and *Fenenbock*: the crime of conspiracy turns on the agreement, not the overt acts. If the alleged agreement was only to commit murder, it cannot be said that an agreement to commit assault with a firearm is a lesser included offense. This is true even when the overt acts may be

37

consistent with a different, unalleged conspiracy.  Here, the information alleged only that defendant Lewis "unlawfully conspire[d] together and with another person and persons whose identity is unknown to commit the crime of MURDER." Conspiracy to commit assault with a firearm is not necessarily included within that allegation, and there was no duty to instruct on it as a lesser included offense.

> C.    *Any Failure to Instruct on Unanimity Was Harmless*

Defendant Lewis next points to the time that passed between the overt acts on September 14 and the subsequent overt acts on November 9, and argues that these acts at most show two separate conspiracies to murder Orange.  His argument continues that the jury should have been instructed on the principle of unanimity.[32]  Lewis agrees that there need be no unanimity on individual overt acts, but argues the instruction was necessary as the jury could conceivably have found two different agreements.

Apart from whether the trial court erred in failing to instruct on unanimity, we conclude any error is necessarily

---

[32]    CALJIC No. 17.01 provides:  "The defendant is accused of having committed the crime of _____ [in Count __]. The prosecution has introduced evidence for the purpose of showing that there is more than one [act] [or] [omission] upon which a conviction [on Count __] may be based.  Defendant may be found guilty if the proof shows beyond a reasonable doubt that [he] [she] committed any one or more of the [acts] [or] [omissions]. However, in order to return a verdict of guilty [to Count __], all jurors must agree that [he] [she] committed the same [act] [or] [omission] [or] [acts] [or] [omissions]. It is not necessary that the particular [act] [or] [omission] agreed upon be stated in your verdict."

harmless. The failure to instruct on unanimity is reviewed for prejudice under the *Chapman* standard of harmlessness beyond a reasonable doubt.[33] (*People v. Wolfe* (2003) 114 Cal.App.4th 177, 180.)

Here, the information alleged a single conspiracy, with overt acts in both September and November 2017. Under this view, Lewis and his co-conspirators Sherrills and Ellsworth initially agree to kill Orange, and later reinvigorated that same agreement with the same co-conspirators. Lewis argues that a jury could have reasonably found two agreements, and it is possible that some jurors found him guilty of a September 14 conspiracy while others found him guilty of a November 9 conspiracy.

The weakness in Lewis's argument is that, even if he is correct that the jury could have found two separate conspiracies, we cannot imagine a scenario that some jurors would have believed the evidence of only a September 14 conspiracy and some would have believed the evidence of only a November 9 conspiracy. Both agreements were evidenced almost entirely by recorded conversations between the conspirators. There is no suggestion that some wiretapped conversations were more credible than others; the police used identical processes and tapped the same phones in both instances. Nor is the evidence such that one agreement was substantially more persuasive than other. On September 14, Ellsworth helped defendant Lewis obtain a gun; on November 6, Ellsworth helped him obtain Orange's location. On both dates, defendant expressed to Sherrills that he intended to kill Orange. Lewis presented no evidence in defense of the conspiracy itself. He only argued that

---

[33] *Chapman v. California* (1967) 386 U.S. 18.

39

the evidence did not demonstrate an intent to kill.[34]  There is no evidence that Lewis and his conspirators did not *really* intend to kill Orange in September, but suddenly developed that intent in November; conversely, there is no evidence that they intended to kill Orange in September, but gave up that intent and were merely posturing in November.  Thus, the failure to give a unanimity instruction was harmless beyond a reasonable doubt.

### 3.    *Gordon's New Trial Motion on Brady Grounds Was Properly Denied*

Defendant Gordon next contends the trial court erroneously denied his motion for new trial.  Gordon had sought a new trial because of the prosecutor's inadvertent failure to disclose the recording of Bradford's very first interview with police detectives.  Gordon contends the nondisclosure constituted a *Brady* violation, because the interview contained additional impeachment material.

*Brady* provides that the government violates the Due Process Clause if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment. (*Turner v. United States* (2017) ___ U.S. ___, ___ [137 S.Ct. 1885, 1888].)  " '[E]vidence is "material" within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.' [Citation.]  'A "reasonable probability" of a different result' is one in which the suppressed evidence ' "undermines confidence in the outcome of the trial." ' [Citation.]  In other

---

[34]    Lewis's counsel argued to the jury that it could infer defendant Lewis did not intend to kill Orange because defendant Lewis committed a crime against Bowden when he could not get to Orange, and he did not kill Bowden, but only robbed him.

words, petitioners here are entitled to a new trial only if they 'establis[h] the prejudice necessary to satisfy the "materiality" inquiry.' [Citation.] [¶] Consequently, the issue before us here is legally simple but factually complex. We must examine the trial record, 'evaluat[e]' the withheld evidence 'in the context of the entire record,' [citation], and determine in light of that examination whether 'there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.' [Citation.]" (*Id.* at p. ___ [137 S.Ct. at p. 1893].

We apply independent review to "mixed questions of law and fact, such as the elements of a *Brady* claim." (*People v. Stewart* (2020) 55 Cal.App.5th 755, 770.)

Here, the parties agree that the prosecution failed to disclose the recording of Bradford's first police interview and that it was favorable to the defense, as it would have impeached Bradford. The issue is whether it was material. In the context of the vast quantity of impeachment material disclosed, we conclude the undisclosed first interview was not material.

A.      *The Undisclosed Initial LAPD Interview*

Bradford was initially arrested on August 31, 2016, and interviewed by LAPD Detective Pearce and his partner. Excluding breaks, the interview lasted about two and one-half hours. Even before Bradford was read his rights, he inquired if he was going to go to jail that day. Detective Pearce responded, "We're gonna find out. Okay, if you lie to us, be dishonest, definitely." Bradford did, in fact, repeatedly lie to the detective. For example, Detective Pearce showed Bradford a video in which Bradford was shaking hands with someone. When Detective Pearce asked Bradford with whom he was shaking hands, he said

41

"I don't know him.  I just show respect-.  You sure that's me?"  He then proceeded to repeatedly deny the image of himself on the video.  He was shown another video in which he appeared; he did not deny that he was in it, but denied knowing anything about the fight that was documented in the video.  The dance continued, with Bradford repeating that he was telling the truth, and the detective saying, "I believe 100% you're lying right now, 100%, 100%."  Bradford eventually swore on his life and on his deceased mother that he was telling the truth.

From this point onward, Bradford began a three-year journey from the baseline of lying about his own image on a video to admitting everything, including that (for another case) he pointed out a victim for his fellow gang members to shoot.

Partway through the initial interview, Detective Pearce said, "[W]e're just trying to get the truth, that's it man."  Bradford said, "And I'm, and uh – and it's coming out slowly but surely, right?"  Detective Pearce said, "Okay.  I, I'll agree with that."  As the interview progressed, Detective Pearce was encouraging, at one point stating, "And we believe you're being honest.  This is good."  Bradford started to admit involvement in several crimes.

B.    *The Disclosed Interview with the Sheriff's Detective*

As a result of the initial interview, Detective Pearce believed Bradford had information about an August 4, 2016 murder investigated by Sheriff's Detective Blagg.  Detective Blagg was contacted, and he and his partner interviewed Bradford later that same day.  The recording of that interview was timely disclosed to defense counsel.  The August 4, 2016 shooting involved three cars on a mission for Grape Street; video evidence placed Bradford in one of the cars.  Bradford first told

42

the sheriffs a number of lies about where he had been headed and why he was headed there. But after Detective Blagg told Bradford what the sheriffs already knew about the shooting, Bradford identified the gang members in the other cars. Defendant Lewis was among the individuals he identified.

At some point later, Bradford was released, and he participated in the Bowden and Arreola robberies.

C. *The Disclosed Proffer Interview*

On May 28, 2019, Bradford signed a proffer agreement, in which he promised to "respond truthfully and completely to any and all questions and inquiries that may be put to him at the proffer meeting(s)." He gave a proffer interview conducted by the district attorney and Detective Blagg that same date. The recording of the interview was timely disclosed to the defense. The district attorney began the interview by stating, "And the most important part about today is that you tell us the truth. And I've done these a number of times and I tell people, you know, when you get interviewed by the police, we sort of expect that a guy isn't going to be totally honest at that point." The district attorney explained that the proffer was different, and honesty was critical. Bradford was interviewed about a number of crimes.

When Detective Blagg questioned Bradford about the unrelated August 4, 2016, shooting, the detective said, "I know that what we talked about, you may have held back just a little bit back then. Now is the time for you to be straight up." Bradford then disclosed more information than he had told Detective Blagg earlier. He admitted he may have participated in the murder, saying, "See, I can't even lie. I could've been pointing. I don't remember." And, if Bradford had seen a Bounty

43

Hunter, "I would have pointed him out." The district attorney responded, "All right. See, that's the honesty that I was asking for."

Bradford also discussed his participation in the Bowden and Arreola robberies during this proffer interview.

D.    *The Disclosed Testimony in Another Case*

On September 3, 2019, Bradford testified in a manslaughter case against defendant Lewis (TA144866).[35] This testimony was given prior to the trial in the present case, and was made available to defense counsel. At that trial, Bradford admitted he had participated in the shooting by identifying the victim for the shooter.[36] He testified that, when he was first interviewed by the sheriff's detective on the subject, he did not

---

[35]    Defendant Lewis was charged with murder in that case, for a shooting that was not the August 4, 2016 shooting. However, the trial court permitted Bradford to testify as to defendant Lewis's involvement in the August 4, 2016 shooting as related to his state of mind. (*People v. Lewis,* Apr. 15, 2021, No. B302108 [2021 WL 1423508].)

[36]    At trial in the current case, counsel for Gordon inquired of the trial court if he could cross-examine Bradford on his changing story with respect to this point – specifically, that Bradford first lied to police, minimizing his role; then, in his proffer, said he could not remember if he pointed out the victim; and, finally, at Lewis's trial in the manslaughter case, admitted that he had pointed out the victim. The court denied permission, on the basis of a pretrial ruling which was apparently designed to keep the facts of the August 4, 2016 murder (in which defendant Lewis was involved) from the jury. Defendant Gordon does not challenge this ruling on appeal.

tell the detective the whole truth, but only pieces of the truth. He testified that he told the whole truth at his proffer.

In cross-examination at the manslaughter trial by counsel for defendant Lewis, Bradford was questioned about his initial August 31 interview with authorities.[37] The following exchange occurred:

"Q    You told a different story than you're telling now, which is a lie, correct?

"A    Yes.

"Q    So you sat in a room with two detectives, you looked them in the eye –"

"A    Yeah.

"Q    --and you told them a story?

"A    Yes.

"Q    And now you come into court now and you look this jury in the eye, and you expect them to believe you; is that what you're hoping for?

"A    Everybody lies to the police."

E.    *Additional Brady Materials*

In addition to these interviews, the prosecution also timely turned over Bradford's criminal history and over 400 pages of police reports relating to the August 4, 2016 shooting.

F.    *Analysis*

At trial in this case, Bradford testified that he was acting pursuant to his agreement with the prosecution, by which he was getting a very good deal – 9 years in prison instead of life without

---

[37]    When asked by whom he was interviewed, he identified both LAPD Detective Pearce and Sheriff's Detective Blagg by name. His testimony did not clarify that he was interviewed by the detectives serially that day, not simultaneously.

parole. He testified that one of the charges to which he pleaded guilty was murder. The details of his participation in the robberies in this case obviously did not reflect favorably on him. He had no dispute with Bowden, but participated in that robbery, and even held a gun on the victim. He had no dispute with Arreola, either; but when he saw Sherrills put Arreola in a chokehold, rather than assist Arreola, he went into Arreola's pocket to steal his cash. In cross-examination, he freely admitted that he lied when first interviewed by law enforcement on August 31, 2016. Bradford explained that he was trying to get released, and it did not work.

Having reviewed the entire history of Bradford's interviews with law enforcement, we conclude that under the standard of review for *Brady* error, there is no "reasonable probability" (*Turner v. United States, supra,* __ U.S. at p. ___ [137 S.Ct. at p. 1888]) that, if Bradford's initial interview with Detective Pearce on August 31, 2016, had been disclosed, the result would have been different. That Bradford was driven only by self-interest was apparent. That he had lied to the police when he thought there might have been something to be gained by lying was not only something he expressly admitted at trial, but a fact referred to by the district attorney and Detective Blagg in the proffer interview, and addressed by Bradford's testimony in cross-examination in Lewis's manslaughter case – all of which were turned over to the defense. Defendant Gordon argues that the interview provided critical impeachment testimony, stating, "Evidence that Bradford lied to the police, profusely and on his mother's life, would have severely compromised his credibility, more so than his participating in these and other violent crimes, including murder." We do not believe initially lying to the police,

46

particularly when followed by truthfully admitting participation in murder, likely compromises a witness's credibility more than actually having participated in the murder. In any event, there was compelling and plentiful evidence, including from Bradford himself, that Bradford had initially lied to the police, repeatedly and poorly. The police knew he was lying, caught him in the lies, and slowly began obtaining the truth. Disclosure of the additional details of those lies would have made no difference, particularly as Bradford testified in Lewis's manslaughter case, "Everybody lies to the police."

## 4. Sentencing Issues

Both defendants argue that SB 567, enacted while this appeal was pending, requires remand for resentencing. (Stats. 2021, ch. 731, § 1, effective Jan. 1, 2022.) SB 567 amended determinate sentencing law to provide that, when a defendant is sentenced under a statute that provides three possible terms, the court shall presumptively impose the middle term. (§ 1170, subd. (b)(1).) "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2).) The court may also consider prior convictions in determining the sentence. (§ 1170, subd. (b)(3).)

Defendants argue, the Attorney General concedes, and we agree that SB 567 applies to cases pending on appeal at the time of its effective date. (*People v. Flores* (2022) ___ Cal.App.5th ___, ___ [2022 WL 2159020, p. *4].) However, remand for

47

resentencing is unnecessary if we conclude, beyond a reasonable doubt, that the jury, applying the same reasonable doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury. (*Id.* at p. __ [2022 WL 2159020 at p. *5].) This is particularly true with respect to factors such as unsatisfactory performance on probation, which can be demonstrated by court records. (*Ibid.*)

A.    *SB 567 Does Not Apply Retroactively to Lewis's Separate and Now-Final Manslaughter Case*

Although SB 567 applies retroactively to this case, as the defendants' convictions were not final on the January 1, 2022, effective date of the law, this is of no assistance to Lewis.

Lewis's sentence in this case consisted of an indeterminate term for the conspiracy to commit murder count, and consecutive (1/3 the middle term) determinate terms on the robbery and conspiracy to commit robbery. In short, Lewis did not receive a high determinate term in this case.

Lewis does not really argue otherwise. What he asserts is that because the trial court re-imposed Lewis's sentence in the earlier case as part of the overall sentence in the present case, that reopened the once-final previous judgment. We disagree.

When a defendant is sentenced to a determinate term consecutive to a determinate term previously imposed, the court in the current case must "pronounce a single aggregate term, . . . stating the result of combining the previous and current sentences." (Cal. Rules of Court, rule 4.452(a).) In the course of doing so, "[t]he court in the current case must make a new determination of which count, in the combined cases, represents the principal term." (Cal. Rules of Court, rule 4.452(a)(2).) When Lewis was sentenced in the present case, the court did so,

48

reimposing the high term from the manslaughter case as the principal term, and adding consecutive terms for the Bowden robbery and Arreola robbery conspiracy in this case. Because the trial court in this case reimposed the sentence in the manslaughter case, Lewis argues that he is entitled to the benefit of SB 567 with respect to that term. Under Lewis's theory, remand for sentencing in the *current* case is required so that the trial court can take into account SB 567's impact on the lawfulness of the upper term imposed in the *manslaughter* case. But a restatement of sentence in order to comply with the aggregate sentencing statute is not a resentencing, and the conviction in the manslaughter case was final before the effective date of SB 567.[38] (*In re Rodriguez* (2021) 66 Cal.App.5th 952, 957.) Accordingly, Lewis is not entitled to the benefits of SB 567.[39]

B. *Gordon is Not Entitled to Remand for Resentencing*

Gordon received the high term for his part in the Bowden robbery. That sentence from the current case is not yet final, and Gordon is presumptively entitled to the benefits of Senate Bill

---

[38] Our opinion in the manslaughter case was issued April 15, 2021. Lewis ultimately sought review by the U.S. Supreme Court, and represents that certiorari was denied on December 6, 2021.

[39] When defendant Lewis filed his opening brief in this case, he reasserted other sentencing issues he had argued in the then-pending appeal in his manslaughter case. He claimed he was reasserting the arguments simply "not to procedurally forfeit" his claims. As we have observed in the text, the appeal in his manslaughter case is final. (*People v. Lewis*, *supra*, No. B302108 [2021 WL 1423508].) There is no reason to reconsider our opinion in that case, and defendant Lewis does not suggest that there is.

No. 567. The trial court explained it was imposing the high term, "not only based upon [Gordon's] record and severity of the crime and, again, the fact that the defendant was on parole for four months when this matter was committed, and just the brazen acts that were seen." That a defendant was on parole at the time of a crime is an aggravating factor identified in the Rules of Court. (Cal. Rules of Ct., rule 4.421(b)(4).) We conclude, beyond a reasonable doubt, that this factor would have been found true if presented to the jury. There is no dispute that Gordon was on parole at the time; in fact his counsel, out of the presence of the jury, stated, "I believe that Mr. Gordon was on parole" when discussing Gordon's GPS ankle monitor. There is therefore no need for remand.

Finally, Defendant Gordon also briefly argues for remand due to an additional change in the determinate sentencing law. Penal Code section 1170, subdivision (b)(6) provides that "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice," the court shall impose the lower term if one of several factors was a contributing factor in the commission of the offense. One of those factors is that the defendant was a youth, as defined under section 1016.7, subdivision (b) at the time of the offense. (§ 1170, subd. (b)(6).) Section 1016.7, subdivision (b) defines a youth as being under 26 at the time of the offense; Gordon was under that age. Although Gordon's sentencing predated this statutory provision, Gordon's counsel requested the court "to take into consideration his youth" in sentencing. The court denied Gordon's motion to strike his prior conviction, then rejected his request to not sentence to the high term. The court relied on Gordon's criminal record, the

severity of the crime, the fact that he was on parole for four months at the time of the robbery, and the brazenness of the offense.  Although the court was aware of Gordon's youth, there is no suggestion that the court believed Gordon's youth was "a contributing factor in the commission of the offense."  Even if it had made such a finding, the record is clear that the court would have found the aggravating circumstances overwhelmed the mitigating circumstance of his age.

### DISPOSITION

The judgments are affirmed.

RUBIN, P. J.

WE CONCUR:

MOOR, J.

KIM, J.

51